# EXHIBIT A



**null / ALL**
**Transmittal Number: 31165188**
**Date Processed: 04/08/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Shannon Shaw<br>Delta Air Lines, Inc<br>1030 Delta Blvd<br>Dept 982<br>Atlanta, GA 30354-1989 |
| **Electronic copy provided to:** | Corena Perla<br>Meg Taylor<br>Victor Ector<br>Komal Patel<br>Andre Lecour<br>Laura Dieudonne |

| | |
|---|---|
| **Entity:** | Delta Air Lines, Inc.<br>Entity ID Number  2078129 |
| **Entity Served:** | Delta Air Lines, Inc. |
| **Title of Action:** | Megan McKenzie vs. Delta Air Lines, Inc. |
| **Matter Name/ID:** | Megan McKenzie vs. Delta Air Lines, Inc. (17149326) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Labor / Employment |
| **Court/Agency:** | Hennepin County District Court, MN |
| **Case/Reference No:** | Not Shown |
| **Jurisdiction Served:** | Minnesota |
| **Date Served on CSC:** | 04/07/2025 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Wanta Thome PLC<br>612-252-3570 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

## Business Record Details »

Minnesota Business Name
# Delta Air Lines, Inc.

**Business Type**
Business Corporation (Foreign)

**MN Statute**
303

**File Number**
23541

**Home Jurisdiction**
Delaware

**Filing Date**
04/03/1984

**Status**
Active / In Good Standing

**Renewal Due Date**
12/31/2025

**Registered Office Address**
2780 Snelling Avenue N
Suite 101
Roseville, MN 55113
USA

**Registered Agent(s)**
Corporation Service Company

**Chief Executive Officer**
Edward H. Bastian
1030 DELTA BLVD
DEPT 982
ATLANTA, GA 30354–1989
USA

Filing History

# Filing History

Select the item(s) you would like to order:   Order Selected Copies

| | Filing Date | Filing | Effective Date |
|---|---|---|---|
| ☐ | 04/03/1984 | Original Filing - Business Corporation (Foreign) | |
| | 04/03/1984 | Business Corporation (Foreign) Business Name (Business Name: Delta Air Lines, Inc.) | |
| ☐ | 11/18/1985 | Amendment - Business Corporation (Foreign) | |

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

---

Megan McKenzie,

          Plaintiff,

v.

Delta Air Lines, Inc.,

          Defendant.

Court File No. _____
Judge: _____

Case type: Employment

**SUMMONS**

---

THIS SUMMONS IS DIRECTED TO DEFENDANT DELTA AIR LINES, INC.:

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this Summons.

2. **YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS.** You must give or mail to the person who signed this Summons a **written response** called an Answer within 21 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this Summons located at:

   WANTA THOME PLC
   100 South Fifth Street, Suite 1200
   Minneapolis, MN 55402

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint. If you do not want to contest the claims stated in the Complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the Complaint.

5. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get

legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.**

6. **ALTERNATE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: April 4, 2025

*/s/ Taylor Volkman*
Joni M. Thome, #0232087
Taylor J. Volkman, #0505182
*Attorneys for Plaintiff*
WANTA THOME PLC
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571
jthome@wantathome.com
tjvolkman@wantathome.com

2

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Megan McKenzie,

           Plaintiff,

v.

Delta Air Lines, Inc.,

           Defendant.

Court File No. _____
Judge: _____

Case type: Employment

**COMPLAINT AND
JURY DEMAND**

Plaintiff Megan McKenzie ("Plaintiff"), for her Complaint against Defendant Delta Air Lines, Inc. (hereinafter, "Delta" or "Defendant"), states and alleges as follows:

## INTRODUCTION

1.    This case is about sexual harassment, sexual assault, and retaliation in the workplace. At twenty-four years old, Plaintiff joined Defendant's workforce with dreams of a long career in the aviation industry, and with Delta. However, Plaintiff quickly discovered a male-dominated work environment permeated with sexism and hypersexual banter. Emboldened by this work environment, a co-worker harassed and ultimately sexually assaulted Plaintiff.

2.    Like many victims of sexual harassment and assault, Plaintiff was deeply afraid of reporting the treatment she endured to Delta. Plaintiff ultimately did report the harassment and assault to Delta's Human Resources Department. Rather than take Plaintiff's complaint and Defendant's legal obligations seriously, Defendant questioned Plaintiff's credibility, dissuaded her from making a complaint, encouraged her to think about the perpetrator's career, and told her that she should expect this sort of behavior working in a male-dominated field. Defendant reluctantly initiated an "investigation" of Plaintiff's assault in which it continued to doubt her version of events and took little action to remediate Plaintiff's work environment. Not long after Plaintiff's

report, Defendant placed Plaintiff on an unpaid suspension and eventually terminated her employment without a coherent or meaningful explanation.

3.     Arising from facts alleged herein, Plaintiff alleges that Defendant's actions violated the Minnesota Human Rights Act, the Minnesota Whistleblower Act, and the Minnesota Workers' Compensation Act.

## PARTIES, JURISDICTION & VENUE

4.     Plaintiff is a natural person who resides in the City of Woodville, County of Calumet, Wisconsin.

5.     Defendant is a Delaware corporation registered to do business in Minnesota and maintains a registered address of 2780 Snelling Avenue N, Suite 101, Roseville MN 55113 and operates out of the Minneapolis Saint Paul Airport ("MSP") at 7500 Airline Drive, Minneapolis, MN 55450.

6.     At all times relevant to the factual basis for Plaintiff's MHRA and MWA claims, Plaintiff was an "employee" within the meaning of Minn. Stat. §363A.03 §*et seq*. and Minn. Stat. §181.931, subd. 2-3.

7.     The acts alleged in this Complaint fall within the general subject matter jurisdiction of this Court because all causes of action arise under Minnesota law.

8.     This Court has personal jurisdiction over the parties because Defendant does business in Minnesota, and the events giving rise to this action occurred in Minnesota.

9.     Venue is proper in the Hennepin County, State of Minnesota, pursuant to Minn. Stat. §542.09. The events giving rise to this action occurred in Hennepin County.

2

## FACTS

### *Plaintiff Enters a Male-Dominated and Hostile Work Environment*

10.     Plaintiff, eager to follow in the footsteps of her father—a longtime employee of Defendant and veteran of the aviation industry—sought out employment with Defendant during the summer of 2021. During August of 2021, Plaintiff began working for Delta on a contract basis.

11.     On April 4, 2022, Plaintiff was hired on a full-time basis as a Tool Room Attendant. Plaintiff was transferred into the role of an Aircraft Support Mechanic in July of 2022.

12.     Plaintiff was just twenty-four years old when Delta hired her on a full-time basis and was eager to start what she hoped would be a long career with Delta and in the aviation industry.

13.     Plaintiff was one of a handful of women working in Cabin Maintenance Department 206 ("the Department"). For this handful of women, putting up with sexist and hypersexual conduct and comments was the price of entry to work in the Department.

14.     While at work, Plaintiff was frequently the target of sexist jokes, comments about women not being able to do the work well, and inappropriate comments of a sexual nature.

15.     For example, one coworker asked Plaintiff, "You know when it looks like a roast beef?" and when Plaintiff was confused and asked for clarification, the coworker replied, "A girl's pussy."

16.     Plaintiff responded by asking the coworker not to say those types of things in front of her, to which the coworker responded by laughing at Plaintiff and calling her sensitive.

17.     A male co-worker, Marcus Smith (hereinafter, "Smith"), expressed a particular interest in Plaintiff. Smith frequently approached and flirted with Plaintiff a month after Plaintiff began working as a full-time Support Mechanic.

3

18.     During August of 2022, Smith's flirting became more aggressive. Smith began to taunt Plaintiff, stating that she probably had a "roster" or "list" of men with whom Plaintiff had sexual contact with. Smith pestered Plaintiff on a near daily basis to be added to Plaintiff's "roster" so that he could have sex with Plaintiff.

19.     Despite Smith's continuous advances, Plaintiff never gave Smith her phone number, texted casually with him, added Smith on social media, nor otherwise encouraged Smith's incessant advances.

20.     Smith would strike up conversations with Plaintiff while following Plaintiff to her car, and in every conversation, Smith repeatedly asked Plaintiff about a "roster" or "list," a reference to men that Plaintiff had sexual relationships with.

21.     Plaintiff felt unsafe and offended by Smith's conduct and insisted that she did not have a "list" or "roster" and told Smith to stop making these sorts of comments.

22.     Smith persisted and his advances only became more aggressive despite Plaintiff repeatedly asking him to stop, and anytime there was no one else within earshot at work, Smith would ask Plaintiff for sex by repeatedly asking Plaintiff to add him to her "list" or "roster."

23.     Smith also made many unwelcome sexual comments to Plaintiff, including:

   a. Telling Plaintiff that her "ass looked great" anytime Plaintiff bent over to tie her shoes;

   b. Telling Plaintiff that Smith had a box full of sex toys in his closet at home, implying that Smith wanted to use the toys with Plaintiff;

   c. Bragging to Plaintiff about sleeping with a married coworker at a prior job; and

   d. Telling Plaintiff that he was sleeping with many different women.

24.     During the Summer of 2022, Smith began following Plaintiff to her car after work and going out of his way to encounter Plaintiff frequently at work.

4

25.     On one occasion in August 2022, when Plaintiff was walking to her car after work, she noticed Smith was in front of her, and when he reached her vehicle, he stopped and waited for Plaintiff. Plaintiff was extremely uncomfortable with Smith's conduct, which made clear that he knew which vehicle was hers and where she parked. Smith tried to initiate contact with Plaintiff, but she quickly told him that she needed to leave, got in her car, and drove away.

26.     By this point, Plaintiff was deeply uncomfortable and felt unsafe at work because of Smith's behavior. Plaintiff continued to be fearful of reporting Smith because the work culture was permeated by a hypermasculine, "boys' club" mentality where offensive and sexual comments about women were the norm and co-workers were expected to cover for one another. Further, Smith was popular in the Department, had more industry experience, and was approximately ten years older than Plaintiff. Given this culture, Plaintiff was afraid that if she reported Smith, she would not be believed, and that Defendant would not take her complaints seriously.

### Plaintiff is Sexually Assaulted by Smith

27.     As of September 2022, at MSP there was a part of the airport referred to by workers as "Hangar 9." Hangar 9 was not an airplane hangar but a code name for a secluded area out of the view of MSP security cameras where workers frequently snuck away to nap, smoke, and use their cell phones.

28.     On September 5, 2022, Plaintiff mentioned to co-workers that she was excited to go on a first date that night. Smith overheard this comment.

29.     As of September 5, 2022, Plaintiff had never been to Hangar 9 but was aware that it was an isolated location outside the view of security cameras.

30.     On September 5, 2022, Plaintiff was teamed up with Smith for an evening shift. Plaintiff and Smith's first task was to clean the flight deck of a plane at Hangar 7. There were other

coworkers performing their own tasks on this plane. Smith and Plaintiff completed cleaning the flight deck, and had a couple hours before the next plane they were assigned to clean was to arrive.

31.     As soon as Smith and Plaintiff finished cleaning the flight deck at Hangar 7, they loaded up their equipment back in the Delta van they had driven to Hangar 7 and got inside. Smith was in the driver's seat.

32.     Smith began driving, and Plaintiff believed he was driving them to the assigned gate to wait for the next plane to arrive. But she soon became concerned when Smith drove past the assigned gate.

33.     Plaintiff asked Smith where they were going, and Smith told Plaintiff that he was going to take them to Hangar 9. Plaintiff, nervous about getting in trouble and scared of going to an isolated location with Smith, instead suggested they wait at the assigned gate for the plane. Smith dismissed her concerns and drove them to Hangar 9.

34.     When Plaintiff and Smith arrived at Hangar 9, it was between 9 and 11pm, it was dark, and they were alone.

35.     Smith quickly turned the conversation to sexual topics. Smith asked Plaintiff which three men in their Department she would have sex with. Plaintiff initially refused to answer, but after Smith insisted and pressured Plaintiff, she gave three names, which did not include Smith.

36.     Smith's demeanor and words made clear that Plaintiff not including him on her "list" wounded him, and Smith asked if she was sure about who she included on the list. Plaintiff stated that she was.

37.     Smith then leaned back in his chair, spread his legs wide, tilted his pelvis up, and made a hand gesture with his palms open, pointing both toward his groin. Plaintiff immediately

understood the body language as a sexual invitation and nervously laughed and tried to make light of the situation.

38.    Plaintiff felt unsafe. Plaintiff had already tried to avoid Smith's sexual hostility and had told him to stop commenting about the supposed "list," but it was clear that Smith was not dissuaded from sexualizing Plaintiff. Plaintiff and Smith were alone in an area with no security cameras, Plaintiff could not call out for help nor rely on the hope that Smith's behavior would be limited by the presence of others. Plaintiff knew that Smith would destroy her reputation or otherwise try to jeopardize her employment and standing in the workplace if she rejected his sexual invitation.

39.    Plaintiff suggested that it would not be safe to engage in any kind of sexual interaction. Smith, still not dissuaded, stated that there were no cameras around, no people around, and that they would not get caught.

40.    At this point Smith unbuckled his seat belt, stood, took a step or two from the driver's seat to the row of seats in the middle of the van, and sat close behind Plaintiff's front passenger seat. Plaintiff was confused by the abrupt change in his seating, turned in her seat to look at Smith, and gave Smith a quizzical look as if to ask him what he was doing. Rather than respond verbally, Smith unbuckled his belt and unzipped his pants.

41.    Plaintiff—stuck in a confined vehicle with a much older, broad-shouldered man who was visibly muscular and who could easily overpower Plaintiff, and in an isolated area with nobody around to call for help—felt that she had no choice but to accede to Smith's demands and began to give him oral sex. The oral sex was nonconsensual.

42.    Smith was rough and mean with Plaintiff throughout the act. At one point, Plaintiff stopped and looked up at Smith, wanting the act to end and intending to say something to him.

7

Before Plaintiff could get a word out, Smith aggressively grabbed Plaintiff by her throat, pulled her face up to his, forcefully kissed her and shoved his tongue into her mouth, and then used his hands to push Plaintiff's head back down, forcing her mouth back onto his genitals. Smith's actions constituted a sexual assault.

43.     Smith kept his hands on top of Plaintiff's head, holding her ponytail in a fist, pushing and pulling her head up and down until forcing her head all the way down and climaxing in the back of Plaintiff's throat. Smith's actions constituted a sexual assault

44.     Plaintiff did not consent to giving Smith oral sex and only performed the act because she feared for her personal safety and her job. As such, the incident was a sexual assault.

45.     After the sexual assault, Smith drove the van to the assigned aircraft's gate and acted as though nothing had happened. Rather, Smith snidely asked Plaintiff, "So are you still going to go on that date?" in reference to the conversation Smith overheard earlier that day.

46.     Plaintiff was in shock and felt as though her mind had left her body. She mustered the strength to finish her shift and tried to continue working normally over the following weeks.

### Smith Spreads Sexually Harassing Rumors About Plaintiff

47.     After the assault, Plaintiff felt anxiety, shame, and fear. She no longer felt safe at work and did not know what to do. Plaintiff's fears about reporting continued.

48.     Plaintiff had to see Smith at work on a near daily basis after the assault and did everything she could to avoid him and cut off all communications.

49.     In October 2022, Plaintiff was descending an external set of metal stairs attached to a gate and Smith spotted her from a vehicle outside that was parked close to the gate.

50.     Smith exited the vehicle almost immediately after seeing Plaintiff, ran to the stairs, paused, and then charged up the stairs taking two steps at a time, intentionally bumping Plaintiff with so much force that she almost toppled over the low railing of the stairs. Had Smith

8

successfully knocked Plaintiff off the stairs, she would have fallen somewhere between ten and fifteen feet onto concrete. Again, Smith acted like nothing happened afterwards.

51.    Not long after Smith's second assault on the stairs, Plaintiff learned from a co-worker, Ethan P., that Smith and his friends were gossiping about Plaintiff behind her back. Ethan P. was reluctant to share specifics because he didn't want to "snitch," but ultimately shared that Smith had been spreading derogatory and sexual rumors about Plaintiff. Among other things, Smith was spreading rumors that Plaintiff was having sex with various men in the Department, including Smith, and that Plaintiff commonly "serviced" men in the Department.

52.    Plaintiff was shocked and re-traumatized by learning that Smith and other men in the Department were spreading fabricated gossip about Plaintiff's sexual activities. Plaintiff also remained deeply concerned that if she came forward about Smith's assault, nobody would believe her. Further, given that Plaintiff's father and boyfriend also worked for Defendant, Plaintiff was humiliated by the idea of the assault becoming public knowledge.

### *Plaintiff Engages in Protected Activity*

53.    On October 23, 2022, Plaintiff confided in a female co-worker about the assault. The female co-worker encouraged Plaintiff to report the incident to Defendant's management.

54.    Encouraged by the support of her coworker, Plaintiff decided to test the waters by first reporting the sexually harassing rumors spread by Smith and others. Accordingly, on or about October 23, 2022, Plaintiff reported the rumors to the team lead on shift for Department 206 that night, "BJ." The female co-worker accompanied Plaintiff and was physically present when Plaintiff reported the rumors to BJ.

55.    BJ was dismissive in response to Plaintiff's protected report, expressed doubt about the rumors, and said that she couldn't prove that Smith started the rumors because Plaintiff had only heard about it second hand.

9

56.     BJ also expressed disdain for women reporting sexual harassment, stating that, "in these situations, women have the power," that Plaintiff needed to "think hard" before reporting and for Plaintiff to "consider Smith's career." Further, BJ stated that women must expect these sorts of rumors to be spread about them when they work in a male-dominated field.

57.     Plaintiff and the female co-worker were appalled by BJ's comments, which validated Plaintiff's fears about reporting the assault.

58.     On October 23, 2022, the female co-worker texted Plaintiff expressing that she was disappointed with BJ's reaction to Plaintiff's report. Plaintiff responded that BJ had validated her fears about reporting and reiterating that BJ had stated that Plaintiff should think of Smith's career.

### Plaintiff Reports the Sexual Assault and Defendant Fails to Meaningfully Investigate or Remediate Plaintiff's Work Environment

59.     In early-November of 2022, Plaintiff gathered the courage to report Smith to Duty Manager Brian Montez. Again, the female co-worker accompanied Plaintiff.

60.     Plaintiff and the female co-worker both reported to Montez a variety of sexist and hostile conduct that routinely occurred within the Department. Plaintiff reported the sexually harassing rumors spread by Smith and others. With the encouragement of the female co-worker, Plaintiff reported Smith's assault to Montez.

61.     Plaintiff sensed that Montez believed her. Montez was visibly upset, told Plaintiff that Smith's behavior was unacceptable and that he would notify Defendant's Human Resources ("HR") Department.

62.     On or around November 19, 2022, HR Manager Ayan Ashamu ("Ashamu") contacted Plaintiff to request an interview about Smith's assault. After gathering some information, Ashamu stated that the matter would be referred to Employee Relations and asked Plaintiff to draft a written statement to send to Employee Relations.

10

63.     Plaintiff initially was optimistic and sent Ashamu her written statement the very next day. Plaintiff described Smith's sexual assault, his sexually harassing behavior, and his attempt to push Plaintiff down the stairs. Plaintiff also disclosed the emotional impact of Smith's behavior, including anxiety and dread about going to work, and why she feared reporting Smith.

64.     In late-November or early-December of 2022, Employee Relations Officer Danielle Bourne ("Bourne") called Plaintiff to discuss her reports about Smith.

65.     Plaintiff was deeply upset during the call and was crying throughout. Bourne was dry and unempathetic as Plaintiff described Smith's sexual assault.

66.     Bourne asked Plaintiff if she had ever had sex with anyone else in the Department. Plaintiff responded that she was in a committed relationship with her boyfriend, who worked in another Department, but that she never had sexual contact with anyone in her Department.

67.     Bourne then stated that she would be contacting Smith for his side of the story and ended the call. Plaintiff was not given any timeline for the investigation nor any idea how Defendant would proceed beyond speaking with Smith.

68.     Despite knowing about Smith's assault, Defendant continued to schedule Plaintiff and Smith on the same shifts. Eventually, after Plaintiff made several requests for a change, Montez changed Plaintiff's schedule so that she would not be working alongside Smith.

69.     On December 9, 2022, and December 16, 2022, Plaintiff contacted Bourne, requesting an update on the investigation. Plaintiff disclosed that she was in therapy to process Smith's assault but would struggle to work through the assault if Defendant did not give her closure and help her feel safe at work again.

70.     Later that day on December 16, 2022, Bourne called Plaintiff. Plaintiff was initially hopeful that there would be some sort of resolution. That hope was shattered when Bourne

11

proceeded to state that Plaintiff's story had "holes" in it and that she doubted Plaintiff's version of events because she "didn't say no." Bourne also criticized Plaintiff for not coming forward immediately despite Plaintiff having explained her fears about reporting the assault in her written statement shared with Employee Relations. Plaintiff, again, cried through the entire call.

71.    Bourne then asked Plaintiff what punishment she believed Smith deserved if the investigation came out in Plaintiff's favor. Plaintiff responded that if termination was on the table, that Smith should be terminated. At the very least, Plaintiff expressed that she did not want to work with Smith ever again and hoped that nothing similar would happen to other employees.

72.    Bourne responded by stating that Defendant could only punish Smith if there was "proof" of the assault and characterized the incident as a "he-said-she-said." Bourne then ominously stated that she did not know if there would be a termination on "either side," heavily implying that Plaintiff's employment was in jeopardy.

73.    After the call, Plaintiff was devastated, as her fears about reporting Smith had proven true. She was ashamed and humiliated, and called in sick for the next several days.

### *Defendant Suspends and Ultimately Terminates Plaintiff*

74.    On December 27, 2022, Smith was summoned to Manager Jim Kohlmann's office and escorted out of MSP.

75.    Almost immediately afterward, Lead Andrew Cannon walked Plaintiff to another office while many co-workers watched. While Plaintiff hoped that she was being brought in to discuss the investigation, Plaintiff was given a letter placing her on an unpaid suspension and her badges were confiscated. Kohlmann explained that the suspension was not his decision but that he was following HR's orders. Cannon and Kohlmann then escorted Plaintiff out of the building.

76.     Defendant's suspension letter indicated that Delta was considering terminating Plaintiff's employment for "the reasons we discussed on December 27, 2022." Kohlmann did not discuss any "reasons" for suspension with Plaintiff on December 27, 2022.

77.     During Plaintiff's suspension, a female co-worker told Plaintiff that sexual rumors about her were still ongoing. Other employees had told a female co-worker that Plaintiff had sex on Delta property in a van. Initially the rumor was limited to Plaintiff having sex with one man, but it ultimately transformed to a rumor that Plaintiff had group sex with five men in the van. Plaintiff was deeply upset by the rumors.

78.     Plaintiff reported her conversation with the female co-worker to Ashamu and expressed concerns about the rumors. In response, Ashamu asked Plaintiff to contact the co-worker again and ask if she would give a statement to Ashamu about the rumors. Plaintiff followed Ashamu's direction and contacted the co-worker. In turn, the co-worker contacted Ashamu directly.

79.     While on suspension, Plaintiff learned that, during a daily shift meeting, Montez sternly advised everyone in the Department to stop spreading rumors about Plaintiff and stated that what happened with Smith and Plaintiff was a sexual assault.

80.     On January 5, 2023, Plaintiff contacted Ashamu about the ongoing rumors. Ashamu asked where the rumors were coming from, as only a handful of people knew about the specifics of the assault (in particular, that it occurred in a van). Plaintiff stated she felt she was being targeted because only her name, and not Smith's, was mentioned in the rumors. Ashamu only responded that Defendant "couldn't help what friends say to each other."

81.     On January 13, 2023, Kohlmann called Plaintiff to schedule a meeting about her employment.

13

82.     On January 17, 2023, Plaintiff met with Kohlmann and another lead in Kohlmann's office. Kohlmann handed Plaintiff a termination letter. Again, Kohlmann said the decision was not his and that he was doing as he was told. As Kohlmann escorted Plaintiff off the premises, he apologized to Plaintiff and said he was disappointed at how the situation had turned out.

83.     As with Plaintiff's suspension letter, Plaintiff's termination letter does not cite a reason but only vaguely claimed that the "reasons" had been discussed with Plaintiff already. No reasons for termination were given to Plaintiff.

84.     On February 6, 2023, Defendant, for the first time, provided a basis for its decision to terminate Plaintiff in a letter. The letter was written by Ashamu.

85.     Defendant's letter stated that Plaintiff was terminated for violating Defendant's Ethics and Business Conduct policies, but did not specify what policy or conduct was at issue.

86.     Defendant's letter further stated that Plaintiff "discussed an ongoing investigation with coworkers and potential witnesses" as a reason for termination, but did not specify which co-workers, witnesses, or what was discussed.

87.     At no point prior to Plaintiff's termination was she provided any reason for her termination.

### Defendant Provides a Post-Hoc Rationale for Terminating Plaintiff

88.     During September of 2023, Plaintiff filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR"). On December 26, 2023, Defendant submitted a Position Statement to the MDHR in response to Plaintiff's charge.

89.     Defendant's Position Statement falsely asserted that Smith's sexual assault on Plaintiff was a consensual encounter, that Plaintiff had admitted to Ashamu that it was consensual, and that Plaintiff was lying about being sexually assaulted to "absolve herself from her own misconduct."

90.    At no point did Plaintiff ever state to Ashamu that Smith's sexual assault was consensual.

91.    Defendant's Position Statement also claimed that Plaintiff violated the confidentiality of the investigation into her complaint.

92.    Defendant, for the first time, explained what specific conduct prompted termination when Defendant submitted a response to Plaintiff's MDHR charge. There, Defendant stated that Plaintiff shared with a co-worker that Defendant was not being fair to Plaintiff in investigating her complaints about Smith.

93.    Delta went on to state "McKenzie admittedly engaged in misconduct and failed to adhere to its expectations of confidentiality during its investigation. Thereafter, Delta made the decision to terminate…" in its position statement.

## COUNT I

### HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff re-alleges all preceding paragraphs of this Complaint.

94.    The Minnesota Human Rights Act ("MHRA") provides that it is an unfair employment practice for an employer, because of sex, to discriminate against an employee with respect to the terms, conditions, facilities, or privileges of employment. Minn. Stat. § 363A.08, subd. 2(3).

95.    When an employer maintains a hostile work environment that alters the terms and conditions of employment for employees of a certain sex, this constitutes sex discrimination under the MHRA.

96.    As a woman, Plaintiff is a member of a protected group.

15

97.    Plaintiff was subjected to unwelcome harassment by male employees who contributed to a male-dominated and hyper-sexual work environment rife with sexist, derogatory, and sexually demeaning comments.

98.    Plaintiff was subjected to unwelcome harassment from Smith when he made inappropriate comments about her body and sexually assaulted her.

99.    Plaintiff was subjected to unwelcome harassment when co-workers spread highly offensive rumors about Plaintiff's sexual activities.

100.    The unwelcome harassment endured by Plaintiff interfered with the conditions of her employment.

101.    Defendant failed to take remedial action when Plaintiff reported that she was subject to sexual harassment.

102.    Under subjective and objective assessments, this harassment was severe enough to affect the terms and conditions of employment.

103.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

104.    Plaintiff demands judgment against Defendant for compensatory damages in an amount to be determined at trial, which may be trebled under the MHRA, plus costs, attorney fees, disbursements, and any other relief provided by law.

## COUNT II

### REPRISAL IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff re-alleges all preceding paragraphs of this Complaint.

105.    The MHRA prohibits "any individual who participated in the alleged discrimination as a perpetrator, [or] employer … [etc.] to intentionally engage in any reprisal against any person because that person … opposed a practice forbidden by [the MHRA]." Minn. Stat. §363A.15(1).

106.    Plaintiff reported violations of the MHRA on October 23, 2022 when she reported sexually-harassing rumors to BJ; in early-November of 2022; on or around November 19, 2022; in late-November or early-December of 2022; and again in late-December or early-January.

107.    Plaintiff suffered retaliation including her complaint regarding sexual harassment and assault being discounted, discredited, and not taken seriously by Defendant; being placed on an unpaid suspension on December 27, 2022; and being terminated on January 17, 2023.

108.    Plaintiff's unpaid suspension and termination qualify as adverse employment actions. Plaintiff's protected reports were the motive for Defendant's retaliatory conduct.

109.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

110.    Plaintiff demands judgment against Defendant for compensatory damages in an amount to be determined at trial, which may be trebled under the MHRA, plus costs, attorney fees, disbursements, and any other relief provided by law.

## COUNT III

### RETALIATION IN VIOLATION OF THE
### MINNESOTA WHISTLEBLOWER ACT

Plaintiff re-alleges all preceding paragraphs of this Complaint.

111.    The MWA prohibits employers from retaliating against employees who make good faith, protected reports of violations, suspected violations, or planned violations of law in the workplace. Minn. Stat. §181.932, subd. 1(1).

112.    To establish a prima facie case of retaliation under the MWA, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) adverse employment action was taken against her; and (3) a causal connection between the two events. *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).

113.    Plaintiff's good-faith reports of sexually harassing rumors and sexual assault implicated violations of the MHRA, and as such, were protected under the MWA. *See* ¶ 106, *supra*. Plaintiff's good-faith reports regarding Smith's sexual assault and subsequent physical assault on the stairway implicated violations of Minnesota criminal law, and as such, were protected under the MWA. *See* Minn. Stat §§ 609.341, 343, 344; 609.224.

114.    Plaintiff was subjected to unlawful retaliation as described above. *See* ¶ 107, *supra*.

115.    Plaintiff's unpaid suspension and termination qualify as adverse employment actions. Plaintiff's protected reports were the motive for Defendant's retaliatory conduct.

116.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

117.    Plaintiff demands judgment against Defendant for compensatory damages in an amount to be determined at trial, plus costs, attorney fees, disbursements, and any other relief provided by law.

## COUNT IV

### RETALIATORY DISCHARGE IN VIOLATION OF THE WORKERS' COMPENSATION ACT

Plaintiff re-alleges all preceding paragraphs of this Complaint.

118.    Minn. Stat. § 176.82, subd 1 prohibits employers from discharging an employee for seeking workers' compensation benefits.

119.    On September 5, 2022, Plaintiff was injured (sexually assaulted) while at work.

120.    At various points in November and December of 2022, Plaintiff reported to Defendant that she was injured (sexually assaulted) while at work.

121.    Plaintiff was "seeking benefits" within the meaning of the Act the moment she informed Defendant of her injury.

122.    On December 27, 2022, Plaintiff was placed on an unpaid suspension, and on January 17, 2023, Defendant terminated Plaintiff's employment. Plaintiff's reports regarding her workplace injury motivated her termination.

123.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

124.    Pursuant to the Act, Plaintiff also seeks punitive damages. *See* Minn. Stat. § 176.92, subd. 1.

19

## PRAYER FOR RELIEF

Therefore, Plaintiff requests that judgment be entered against Defendant for the following:

a.   Declaring that Defendant's acts or omissions described in this Complaint constitute violations of applicable federal and state laws which protect Plaintiff;

b.   Enjoining Defendant and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all other persons acting in concert or participation with it, from its unlawful acts;

c.   Requiring Defendant to make Plaintiff whole for its adverse, retaliatory, and discriminatory actions with compensatory damages and with interest of an appropriate inflation factor;

d.   Awarding Plaintiff attorneys' fees, costs, and disbursements pursuant to statute; and

e.   Granting other and further relief as the Court deems fair and equitable.

To the extent Defendant engaged in acts manifesting intentional or reckless disregard for Plaintiff's rights and safety, Plaintiff reserves the right to amend this Complaint and pray for punitive damages.

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS.

Dated: April 4, 2025

*/s/ Taylor Volkman*
Joni M. Thome, #0232087
Taylor J. Volkman, #0505182
*Attorneys for Plaintiff*
WANTA THOME PLC
100 South Fifth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 252-3570
Facsimile: (612) 252-3571
jthome@wantathome.com
tjvolkman@wantathome.com

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated: April 4, 2025

*/s/ Taylor Volkman*
Joni M. Thome, #0232087
Taylor J. Volkman, #0505182

21